Linwood E. BRILEY

v.

E.L. BOOKER, Warden.

Civ. A. No. 84–0590–R.

United States District Court,
E.D. Virginia,
Richmond Division.

Oct. 2, 1984.

William H. Allen, William E. O'Brian, Jr., Timothy C. Hester, Covington & Burling, Washington, D.C., Deborah C. Wyatt, Charlottesville, Va., for plaintiff.

James E. Kulp, Sr. Asst. Atty. Gen., Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

On 21 September 1984 petitioner, by counsel, submitted his motion for a stay of execution and a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. It was filed on 24 September *in forma pauperis*. In view of the impending execution date the Court entered an order establish-

ing an expedited briefing schedule on the date of submission.[1]  Respondents submitted their reply in opposition to petitioner's motion for a stay of execution on 25 September.  On 26 September respondents submitted a motion to dismiss and a motion for summary judgment.  Petitioner's reply memorandum in support of the motion for a stay of execution was filed on 27 September and petitioner's reply to respondents' motion to dismiss and motion for summary judgment was submitted on 28 September. These motions, all filed in accordance with the briefing schedule, are ripe for consideration.  The Court has jurisdiction pursuant to 28 U.S.C. § 2254.

## PROCEDURAL HISTORY

Petitioner attacks a judgment of the Circuit Court of the City of Richmond dated 21 February 1980 wherein he was convicted of capital murder by a jury and was sentenced to death.  Petitioner's conviction and death sentence were affirmed by the Virginia Supreme Court on 26 November 1980.  *Briley v. Commonwealth*, 221 Va. 532, 273 S.E.2d 48 (1980).  The United States Supreme Court denied certiorari on 26 May 1981.  451 U.S. 1031, 101 S.Ct. 3022, 69 L.Ed.2d 400.  Petitioner filed a petition for writ of habeas corpus in the Circuit Court for the City of Richmond on 15 October 1981 which was denied on 18 December 1981.  The Virginia Supreme Court denied the petition for appeal from the denial of the State habeas on 5 October 1982 and denied a petition for a rehearing on 3 December 1982.  The United States Supreme Court denied certiorari on 18 April 1983.  460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 367.

Petitioner filed a federal petition for writ of habeas corpus in this Court on 12 May 1983.  After an evidentiary hearing on 31 August 1983 and the filing of an amended petition on 16 September 1983, the petition was denied on 19 April 1984.  *Briley v. Bass*, 584 F.Supp. 807 (E.D.Va.1984).  Peti-

---

1.  The Court was aware that the same issues had just been briefed by the parties before the Su-

preme Court of Virginia.

tioner noted his appeal from this Court's judgment on 27 April 1984 and this Court issued a certificate of probable cause on 29 April. On 7 August the United States Court of Appeals for the Fourth Circuit heard oral argument on petitioner's appeal and shortly thereafter issued a stay of petitioner's execution. The Court of Appeals affirmed the judgment of this Court denying the petition for a writ of habeas corpus on 23 August 1984. *Briley v. Bass,* 742 F.2d 155 (4th Cir.1984). A motion for rehearing, with suggestion of rehearing en banc, was filed with the Court of Appeals on 6 September. This motion was denied by order entered on 26 September. Petitioner has filed a petition for a writ of certiorari with the United States Supreme Court with respect to the affirmation by the Court of Appeals. The petition for a writ of certiorari is pending.

On 24 August petitioner filed a second habeas corpus petition in the Supreme Court of Virginia in which he raised as grounds for relief the claims which are now pending before this Court. The State habeas corpus petition was dismissed by the Virginia Supreme Court as being procedurally barred on 7 September 1984. On 10 September petitioner's date of execution was re-set by the Circuit Court for the City of Richmond for 12 October 1984.

On 21 September, as noted, this petition was submitted.

### RULE 9(b)

In their response of 26 September, respondents argue and ask for dismissal on the ground that petitioner has abused the writ of habeas corpus as contemplated by Rule 9(b) of Rules Governing 28 U.S.C. § 2254. The language of Rule 9(b) of the Rules Governing § 2254 is as follows:

A second or successive petition may be dismissed if the judge finds that it fails to allege new or different grounds for relief and the prior determination was on the merits or, if new and different grounds are alleged, the judge finds that the failure of the petitioner to assert those grounds in a prior petition constituted an abuse of the writ.

Petitioner had filed his original federal habeas corpus petition with this Court on 12 May 1983 and had submitted an amended petition on 16 September. This Court entered a judgment on the merits denying the petition as amended on 19 April 1984. In the present habeas corpus proceeding petitioner raises two issues based on case law and research which he claims were first "developed" in the fall of 1983, after he had filed his original federal habeas petition with this Court.

■ The respondents have properly raised a Rule 9(b) argument and pursuant to *Jones v. Estelle,* 722 F.2d 159, 164 (5th Cir.1983), the petitioner bears the burden of showing by a preponderance of the evidence that he has not abused the writ. Petitioner argues that he should not be expected to have raised these new issues in his original federal habeas petition because these claims had not previously been raised in his State habeas proceeding or on direct appeal and, hence, were not exhausted at the time he filed his federal petition in May 1983. Citing *Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982), he argues that only exhausted claims could have been presented to this Court. Petitioner further argues that it was not until the fall of 1983 that both case law and social science research provided petitioner with a "reasonable basis" on which to advance these claims. *See* Petitioner's Memorandum of Law in Support of the Petition for Writ of Habeas Corpus at 5, fn. 2 [hereinafter referred to as Petitioner's Memorandum].

Petitioner's first new substantive claim is based on his allegation that he was denied a fair trial because of Virginia's jury selection procedures. Petitioner relies on the Supreme Court's explicit reservation on this issue in *Witherspoon v. Illinois,* 391 U.S. 510, 520 n. 18, 88 S.Ct. 1770, 1776 n. 18, 20 L.Ed.2d 776 (1968); yet he asserts that the social science and case law which would give him a reasonable basis to advance his claims were not available to him until September 1983.

In *Hutchins v. Woodard,* 730 F.2d 953, 957 (4th Cir.1984), Judge Murnaghan observed that the sociological data upon which *Keeten v. Garrison,* 578 F.Supp. 1164 (W.D.N.C.1984), *rev'd,* 742 F.2d 129 (4th Cir.1984) and *Grigsby v. Mabry,* 569 F.Supp. 1273 (E.D.Ark.1983), were based was available to the legal profession no later than September 1983 as part of the public record in the *Keeten* consolidated cases. The *Hutchins* court noted that the *Grigsby* opinion had been issued on 5 August 1983 therefore "the existence of the contention and the fact that it had secured the support of one federal district judge were matters of which Hutchins, through his counsel, was clearly chargeable with knowledge." 730 F.2d at 957.

The petitioner in this case relies on the same issue presented in *Hutchins* and thus must be charged with the same knowledge. When petitioner filed his amended petition on 16 September 1983 he was on notice that *Grigsby* had been decided and, indeed, petitioner referred to the *Grigsby* opinion in that habeas corpus proceeding. *See* Petitioner's Second Response in Opposition to Motion to Dismiss, at p. 12, filed on 10 October 1983.

Concerning plaintiff's second substantive claim, the alleged discriminatory application of the Virginia death penalty, petitioner admits that he was aware in October of 1983 of the Gross and Mauro study on which he relies to support his claim. Petitioner's Memorandum at 61. The Gross and Mauro study, however, broke no new ground. A similar argument was presented in *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), over a year before petitioner's trial in February 1980. Petitioner had all the relevant information necessary to present these claims by his own admission as early as October 1983. He argues, however, that they could not properly be presented in his federal habeas claim since they had not then been exhausted in a State habeas proceeding.

In *Jones v. Estelle* the Fifth Circuit observed that while petitioner may have an excuse in a given case for an omission, "that the omitted claim was not then exhausted is alone not enough." 722 F.2d at 169. In *Rose v. Lundy,* 455 U.S. 509, 539, 102 S.Ct. 1198, 1214, 71 L.Ed.2d 379 (1982) the Supreme Court clarified the proposition that an assertion of unexhausted claims in conjunction with exhausted claims in a single petition necessitates dismissal of the "mixed" petition. Dismissal and alternatives to dismissal were spelled out. *Rose v. Lundy* would have little meaning if petitioner could, with impunity, circumvent its holding by merely withholding his unexhausted claims.[2]

Petitioner's first federal petition for a writ of habeas corpus was not denied by this Court until April of 1984, over six months after he admits he possessed knowledge sufficient to present these claims. Petitioner's argument that they could not be presented to the federal forum because unexhausted is unconvincing in light of the fact that the State in that proceeding waived exhaustion as to petitioner's claim that he was denied necessary *Brady* material. See *Briley v. Bass,* 584 F.Supp. 807, 813–814 (E.D.Va.1984). Further, at no time prior to the Fourth Circuit's decision on 7 August 1984 affirming this Court did petitioner act to exhaust his State court remedies concerning the claims he now raises. Petitioner's strong (and understandable) desire to delay, is a sufficient explanation for his tactics.

In *Sanders v. United States,* 373 U.S. 1, 17, 83 S.Ct. 1068, 1078, 10 L.Ed.2d 148 (1963), the Supreme Court identified as an abuse of the writ of a prisoner's deliberately withholding a ground for federal collateral relief at the time of filing his first federal habeas petition. As this Court recently noted, it is not clear that deliberate withholding is the only ground upon which a finding of abuse may be made. *United States v. Berryman,* 558 F.Supp. 120, 121 (E.D.Va.1983).

---

2. This Court has previously noted the fundamental difference in the thrust of a habeas petition in a non-capital case with the objective of a petitioner in a capital case. *Stamper v. Baskerville,* 531 F.Supp. 1122, 1131 (E.D.Va.1982); *Briley v. Bass,* 584 F.Supp. 807, 845 (1984).

Characterizing conduct as inexcusable is difficult at best, certainly instances exist where a petitioner's failure to assert a ground in a previous petition is readily seen to be excusable. These instances may arise from a retroactive change in the law or with a petitioner receiving newly discovered evidence. The Supreme Court's example in Sanders, deliberate withholding, is readily seen as inexcusable. Most cases lie in between.

*Id.*

In *Jordan v. Procunier,* 571 F.Supp. 371 (E.D.Va.1983), *aff'd,* 735 F.2d 1356 (4th Cir. 1984), this Court held that a *pro se* petitioner, who omitted a claim falling within the list printed on the form petitioners use in presenting initial habeas petitions, was guilty of inexcusable neglect. *Id.* at 374. In subsection "h" of 28 U.S.C. § 2254, App. of Forms, a *pro se* petitioner's attention is called to all claims of "conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled." Petitioner, represented by counsel, raises precisely such claims. Petitioner would have this Court rule that a petitioner represented by counsel should be held to a lower standard than the *pro se* petitioner in *Jordan.* The Court is unwilling to accept this proposition.

▪ The Court notes that petitioner has failed to respond to the 9(b) motion with affidavits regarding petitioner's intent, nor has counsel averred that they were unaware of *Spinkellink* or footnote 18 in the *Witherspoon* opinion on 12 May 1983, when petitioner filed his original federal petition. Consequently, petitioner has failed in his burden to come forward with *evidence,* not mere legal arguments, that this petition is not an abuse of the writ. Although this Court is not wholly persuaded that petitioner has withheld these claims in bad faith, under *Jordan* and *Berryman* petitioner's conduct must be described as inexcusable neglect constituting an abuse of the writ.

The Supreme Court recently addressed the issue of a Rule 9(b) dismissal in the context of a capital murder case. *Woodard v. Hutchins,* —— U.S. ——, 104 S.Ct. 752, 78 L.Ed.2d 541 (1984). In *Woodard* the Court vacated a stay of execution which was entered by a single circuit court judge of the Fourth Circuit. The reasoning of the Supreme Court affirmed the district court's ruling that Rule 9(b) was an appropriate mechanism for dismissing the petitioner's "eleventh hour" successive habeas petition. The Court stated that "this case is a clear example of an abuse of the writ that § 2254(b) was intended to eliminate. All three of Hutchins' claims could and should have been raised in his first petition for federal habeas corpus." *Id.* —— U.S. at ——, 104 S.Ct. at 753, 78 L.Ed.2d at 544.

> This Court is well aware of the fact that: [A] pattern seems to be developing in capital cases of multiple review in which claims that could have been presented years ago are brought forward—often in a piecemeal fashion—only after the execution date is set or becomes imminent. Federal courts should not continue to tolerate—even in capital cases—this type of abuse of the writ of habeas corpus.

*Woodard* —— U.S. at ——, 104 S.Ct. at 753, 78 L.Ed.2d at 544. Accordingly, this Court finds that petitioner has abused the writ under Rule 9(b) and the petition shall be DISMISSED.

### THE *WAINWRIGHT* DOCTRINE

Recognizing the finality of the death sentence, when carried out, and being mindful that a ruling under Rule 9(b) is procedural and discretionary, I believe a further inquiry into the issues presented is appropriate in this case.

Under *Wainwright v. Sykes,* 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977), the federal courts are precluded from addressing the merits of a constitutional claim presented by a State prisoner in a federal habeas proceeding if, in contravention of a State's contemporaneous objection rule,[3]

---

**3.** The second State habeas corpus proceeding was dismissed by the Virginia Supreme Court specifically on this ground.

those claims were not asserted at trial. This procedural bar can be removed if the petitioner establishes that there was "cause" for his failure to present the claims, and that actual prejudice flowed from such excusable noncompliance with State law. The Commonwealth argues that petitioner cannot establish "cause" for his State court procedural default, because the "means were available" for petitioner to raise these issues at trial. Respondent's Motion to Dismiss at 10, 11, and 15.

Recently the Supreme Court of the United States addressed the question of the scope of the term "cause" under *Wainwright*. Under *Reed v. Ross*, — U.S. —, 104 S.Ct. 2901, 2910, 82 L.Ed.2d 1 (1984), "cause" will be recognized if counsel "fails to raise a claim for which there was no reasonable basis in existing law." Petitioner argues that the instant claims meet the *Reed* standard because there was not, prior to early autumn of 1983, a "reasonable basis" on which petitioner could have "realistically appealed his conviction." *Id.* 104 S.Ct. at 2912.

The Court in *Reed* added definition to the term "reasonable basis" by stating that "where a constitutional claim is so novel that its legal basis is not reasonably available to counsel, a defendant has cause for his failure to raise the claim in accordance with applicable State procedures." *Id.* 104 S.Ct. at 2910. In *Reed*, petitioner, Ross, had been convicted of first degree murder. At trial Ross had claimed lack of malice and self defense. The trial judge instructed the jury that the defendant had the burden of proving each of these defenses. Ross was convicted. Six years later the Supreme Court decided *Mullaney v. Wilbur*, 421 U.S. 684, 95 S.Ct. 1881, 44 L.Ed.2d 508 (1975), which struck down as unconsti-

tutional any requirement that a defendant bear the burden of proving the element of malice. Ross' petition for a writ of habeas corpus, citing *Mullaney*, followed. In finding "cause" for counsel's failure to object to the instructions at trial, the *Reed* Court noted that the first case in which the Court addressed the constitutional foundation of the requirement that criminal guilt be established beyond a reasonable doubt, *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), was decided over one year *after* defendant Ross' conviction. *Reed*, 104 S.Ct. at 2902.

In contrast the instant petition presents a situation in which there was a reasonable basis to argue petitioner's claims at the time of trial. The petitioner in his brief frequently cites the Supreme Court's decision in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). There the Court explicitly noted that a defendant "in some future case might still attempt to establish that a jury [which had been 'death qualified' in compliance with the *Witherspoon* standard] was less than neutral with respect to guilt." *Id.* at 520 n. 18, 88 S.Ct. at 1776 n. 18. Respondents cite in their brief numerous studies spawned by the *Witherspoon* opinion dealing with this subject and available prior to petitioner's trial in February 1980.[4]

Petitioner argues that if "cause" could not be established in circumstances where defense counsel lacked any basis for perceiving a "reasonable chance" to prevail on a particular claim in State court, then "counsel on appeal would be obliged to raise and argue every conceivable constitutional claim, no matter how far-fetched, in order to preserve a right for post-conviction relief upon some future unforeseen

---

**4.** *See* Zeisel, *Some Data on Juror Attitudes Towards Capital Punishment* (Center for Studies in Criminal Justice, University of Chicago Law School, 1968); Goldberg, *Toward Expansion of Witherspoon: Capital Scruples, Jury Bias, and Use of Psychological Data to Raise Presumptions in the Law,* 5 Harv.Cir. Rights—Civ.Lib.L.Rev. 53 (1970); Jurow *New Data on the Effect of a "Death Qualified" Jury on the Guilt Determination Process,* 84 Harv.L.Rev. 567 (1971); Louis Harris and Associates, Study No. 2016 (1971),

reported in part in White, *The Constitutional Invalidity of Convictions Imposed by Death-Qualified Juries,* 58 Cornell L.Rev. 1176 (1973); Ellsworth et al., *Juror Attitudes and Conviction Proneness: The Relationship between Attitudes towards the Death Penalty and Predisposition to Convict* (1979); 1 Bronson, *On the Conviction Proneness and Representativeness of the Death-Qualified Jury: An Empirical Study of Colorado Veniremen,* 42 U.Colo.L.Rev. 1 (1970).

development in the law.... Lawyers representing appellants should be encouraged to limit their contentions on appeal to those which may be legitimately regarded as debatable." *Reed*, 104 S.Ct. at 2910, (quoting *Ross v. Reed*, 704 F.2d 705, 708 (4th Cir. 1983)).

Petitioner interprets the "cause" standard to mean a reasonable chance of success upon the merits and argues that, until August 1983 when *Grigsby v. Mabry* was decided, no petitioner could have thought he had a reasonable chance of success. Using petitioner's logic it would follow that the petitioner in *Grigsby* did not have a reasonable chance of success and therefore his argument was not "legitimately regarded as debatable." In light of the Supreme Court's reservation of this issue over fifteen years ago in *Witherspoon*, petitioner's argument that, pre-*Grigsby*, such claims were not legitimately debatable and were without a "reasonable basis" in law is not tenable. The Supreme Court's reservation of this issue was an ample invitation to the legal profession to venture. The spate of sociological and legal articles, which still continues, shows the invitation received widespread acceptance.

■ In petitioner's second claim he alleges that recent statistics establish discrimination in the administration of the death penalty under Virginia's statute. A similar argument was raised and reported in the decision of *Spinkellink v. Wainwright,* 578 F.2d 582 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), over a year before petitioner's trial. Petitioner argues that he perceived the futility of raising this argument at trial on the basis of the Virginia Supreme Court's decision in *Turner v. Commonwealth*, 221 Va. 513, 273 S.E.2d 36 (1980), *cert. denied*, 451 U.S. 1011, 101 S.Ct. 2347, 68 L.Ed.2d 863 (1981).[5]

In *Engle v. Isaac*, 456 U.S. 107, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982), the Supreme Court noted that the perceived futility of presenting an objection to the State courts

cannot, alone, constitute cause. *Id.* at 130, 102 S.Ct. at 1573. Nor is failure to anticipate a change in the law sufficient to constitute cause "where the basis of a constitutional claim is available." *Id.* at 134, 102 S.Ct. at 1575. It does not appear that the more recent decision in *Reed* affects the validity of the *Engle* standard. It is inescapable, then, that the arguments and claims petitioner now makes were in legal contemplation very much in the "public domain" at the time of his trial. It may have been useless to raise them at trial in counsel's view, but the existence, the nature, and the Supreme Court's interest in such claims was apparent to any trial lawyer. Therefore it is the holding of this Court that petitioner's claims are barred under the *Wainwright* doctrine. The petition shall be DISMISSED on that ground.

## JURY SELECTION

Although under *Wainwright* this Court is precluded from basing its holding on the substantive merits of petitioner's claims, I recognize the inherent uncertainty in any judicial decision and, in deference to the Supreme Court's admonition that "the death sentence is qualitatively different from all other sentences and therefore special care is exercised in judicial review," *Sullivan v. Wainwright*, — U.S. —, —, 104 S.Ct. 450, 452, 78 L.Ed.2d 210, 213 (1983), the Court will proceed to address the merits of petitioner's substantive claims.

Petitioner presents two related substantive arguments in support of his petition for writ of habeas corpus. The first argument, that he was "convicted by a jury selected in violation of his Sixth and Fourteenth Amendment rights," Petitioner's Memorandum at 6, has three distinct subparts.

■ Conceding that "the state has an undoubted right to strike for cause all members of the venire whose 'attitude toward the death penalty would prevent them

**5.** The Court notes that the *Turner* decision was handed down on the same day, 26 November 1980, as the decision in petitioner's appeal of his

conviction. It seems improbable that petitioner was relying at trial on an opinion that had not yet been written.

from making an impartial decision as to the defendant's guilt,'" Petitioner's Memorandum at 10–11 (quoting *Witherspoon*, 391 U.S. at 522 n. 21, 88 S.Ct. 1777 n. 21), petitioner contends that the "exclusion of jurors unalterably opposed to the death penalty who *could* render an impartial decision as to his guilt or innocence deprived him of his constitutional rights." Petitioner's Memorandum at 11.

Case law does not support this proposition. In *Spinkellink v. Wainwright,* 578 F.2d 582, 592 (5th Cir.1978), *cert. denied,* 440 U.S. 976, 99 S.Ct. 1548, 59 L.Ed.2d 796 (1979), two veniremen were striken for cause because they were unalterably opposed to the death penalty, even though "both veniremen stated unambiguously that they could fairly judge Spenkellink's guilt or innocence." The Fifth Circuit unequivocally held that the "veniremen were properly excluded for cause and there was no *Witherspoon* violation." *Id.* at 593.[6] *See also Martin v. Blackburn,* 521 F.Supp. 685, 701–02 (E.D.La.1981), *aff'd sub nom. Martin v. Maggio,* 711 F.2d 1273 (5th Cir. 1983).

In *Barfield v. Harris,* 540 F.Supp. 451, 463–64 (E.D.N.C.1982), the district court adopted the reasoning of the *Spinkellink* court. The Fourth Circuit in affirming *Barfield,* though not explicating on the district court's discussion of *Spinkellink,* stated that the other contentions raised (which necessarily would include the adoption of the *Spinkellink* reasoning) "were more than adequately handled by the district judge in his opinion" and "[a]s to those contentions, we affirm for the reasons stated by the district judge." 719 F.2d 58, 63 (4th Cir.1983), *cert. denied,* — U.S. —, 104 S.Ct. 2401, 81 L.Ed.2d 357 (1984).

Petitioner nevertheless argues that even though there is a legitimate reason to exclude from the *sentencing* stage those persons unalterably opposed to the death penalty, there is no valid reason to exclude from the *trial* stage those jurors who are unalterably opposed to the death penalty but who could render a fair verdict as to guilt or innocence. Although the theoretical logic of petitioner's argument must be conceded, if petitioner's argument were accepted, a bifurcated *jury,* rather than a bifurcated trial, would be mandated in capital murder trials.

■ Circuit Judge Murnaghan addressed and rejected this very issue in his separate opinion in *Hutchins v. Woodard,* 730 F.2d 953, 959–60 & n. 10 (4th Cir.1984). A system such as petitioner recommends is not feasible nor is it required by the Constitution. If it were adopted, it would be necessary in every capital murder proceeding to have two separate and distinct trials, *i.e.,* a guilt trial with one panel of jurors and a sentencing trial with a second panel. The second trial, in order to give the sentencing jury a factual basis for its sentence, would essentially be a duplication of the first, except that in the second trial both sides, armed with transcripts of the first trial, would be able to attempt to impeach an adverse witness every time his testimony deviated even slightly from his testimony in the first trial. Not only would the second trial be time-consuming and expensive, it could be so confusing as to deny both the defendant and the State the right to a fair trial. A bifurcated jury such as petitioner suggests "would mandate a departure from a procedure dating back to the origins of the Republic and further back in England." 730 F.2d at 959. Petitioner has not established that such a step is constitutionally required.

Petitioner next asserts that he was denied his right to a jury comprised of a fair cross-section of the community because the process used to select the jury excluded from the *jury pool*[7] "distinctive groups in the community." Petitioner's Memoran-

---

6. In *Spinkellink* there was a bifurcated trial using the same jury. After guilt was determined there was a second proceeding on the issue of penalty. The determination of the jury in the penalty phase was reached by majority vote and was advisory only. 578 F.2d at 587–88 & n. 7.

7. "Petitioner does not challenge on fair-cross-section grounds the composition of the petit jury that convicted him...." Petitioner's Memorandum at 23.

dum at 23 (*quoting Taylor v. Louisiana*, 419 U.S. 522, 538, 95 S.Ct. 692, 701, 42 L.Ed.2d 690 (1975)). Petitioner contends that the distinctive group excluded from the pool is "those members who are unalterably opposed to the death penalty." He further contends that women and blacks are indirectly excluded because studies cited by petitioner indicate that a higher percentage of blacks and women, as opposed to the population as a whole, are unalterably opposed to the death penalty.

■ Petitioner has attempted to distinguish between the petit jury [8] and the jury pool. This Court rejects that distinction. Surely if it is permissible to excuse for cause someone from serving on the petit jury, it is permissible to exclude for cause that same person from the jury pool. Less than two months ago the Fourth Circuit ruled that "the state may thus exclude such jurors [members of the venire irrevocably opposed to capital punishment] without violating a defendant's right to a fair cross-section of the community." *Keeten v. Garrison*, 742 F.2d 129, 133–134 (4th Cir.1984). Therefore, the exclusion of veniremen from the jury pool who were unalterably opposed to the death penalty did not violate petitioner's right to a jury pool composed of a fair cross-section of the community.

Petitioner's pleadings and exhibits do not include any information or statistics that would inform the Court as to the percentage of women and blacks who were: registered to vote; included in the venire pool; included in this particular venire; or who actually served on the jury. The only information petitioner presents to support his argument is that sixteen "members of the venire were stricken for cause ... because they had expressed unequivocal opposition

to the death penalty." Petitioner's Memorandum at 6–7. Of these sixteen, eight were men and eight were women. *Id.* at 7 n. 3.

The United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, 20 L.Ed.2d 776 (1968), said that a State may demand that a venireman "not be irrevocably committed, before the trial has begun, to vote against the penalty of death regardless of the facts and circumstances that might emerge in the course of the proceedings." Accepting the research studies presented by petitioner as true and accepting as true petitioner's contention that a "disproportionate" number of blacks and women were excluded at a stage in the jury selection process, petitioner's argument is unpersuasive—because the question asked is constitutionally permissible. If studies or surveys show that certain socio-economic groups have particular opinions about the laws and these groups are excused from jury service because of these beliefs, the exclusion is constitutionally permissible because it is not based on an immutable characteristic such as sex or race.[9]

To hold that the jury concerned with guilt or innocence would be unrepresentative, if all prospective jurors inflexibly opposed to the death penalty were excludable for cause, essentially begs the question. A juror prejudiced or biased for any reason, upon exclusion for cause, renders a jury "unrepresentative" in that untenable sense. For example, over half the eligible jurors might, in a county where prejudice runs high, be unable to judge fairly in a case involving a plaintiff and a defendant of different races. A jury made up from the minority who

---

**8.** *See supra* note 7.

**9.** Analogizing this situation to Title VII adverse impact cases, petitioner bears the initial burden to establish that the effect of a given test has a disproportionate impact on a protected class. After plaintiff makes this showing the burden shifts to defendant to articulate a legitimate business purpose.

In the case at bar, petitioner has established that the death qualification process disqualifies

a disproportionate number of blacks and women from jury duty. The State has advanced as a legitimate substantive interest the necessity of having only those members of the community who are "willing to consider all of the penalties provided by state law," 391 U.S. 510, 522 n. 21, 88 S.Ct. 1770, 1777 n. 21, serve as jurors in a capital murder trial. Thus, in Title VII parlance, the test is "validated."

would not be so biased would not be unrepresentative for constitutional purposes, even though more than 50% of the pool from which it would otherwise be drawn were excluded. 730 F.2d at 960–61 (Murnaghan, separate opinion).

Accordingly, petitioner has not been denied impermissibly a trial by a representative cross-section of the community.

■ Petitioner also contends that by questioning veniremen about their views on the death penalty during voir dire, " 'the key participants, the judge, the prosecutor and the defense counsel convey the impression that they all believe the defendant is guilty, that the 'real' issue is the appropriate penalty, and that the defendant really deserves the death penalty.' " Petitioner's Memorandum at 21 (quoting Grigsby v. Mabry, 569 F.Supp. 1273 (E.D.Ark.1983)). Petitioner cites one study in support of this proposition. That study recorded the reaction of 67 persons. The words of the Supreme Court, used in another context are equally applicable here, "[t]he data adduced by the petitioner ... are too tentative and fragmentary to establish that jurors," questioned about their views on the death penalty will conclude, on the basis of that question, that a defendant is guilty. *Witherspoon*, 391 U.S. at 517, 88 S.Ct. at 1774. But even given the validity of the study, in order to obtain a jury willing to obey the law it is *necessary* that the question be asked. The alternative is a lawless jury and no provision of the Constitution requires that.

## ADMINISTRATION OF VIRGINIA'S DEATH PENALTY

Petitioner's second substantive argument in support of his habeas petition claims that "the arbitrariness and discrimination in the administration of the death penalty in Virginia violates petitioner's rights under the Eighth and Fourteenth Amendments." Petitioner's Memorandum at 35. Petitioner asserts that statistics demonstrate that a defendant convicted of killing a white person stands a much greater chance of receiving the death sentence than does a person convicted of killing a black; and that if the killer of the white person is black, his odds of receiving the death penalty are increased significantly.

■ Any system designed by man is and will be imperfect. So it is entirely possible that race consciousness may enter into the imposition of the death penalty, either favorably to blacks, whites, men, or women or unfavorably to any of them. And at varying times and in different localities one group or the other may be preferred or discriminated against. Under our governmental system, the courts judge the cases that are presented to them, while Congress and the State legislatures enact legislation that deals with the social consequences of the laws. Thus while the legislature may repeal the death penalty because it perceives it to be unfair or discerns racial discrimination in its application, a judge cannot "repeal the death penalty" in a given case even if he perceives it to be, in his estimation and by his lights, generally unfair.

The question before the court in a given case is whether the individual received a reasonably fair trial following procedures prescribed by due process. The question is not whether other persons in other circumstances received a fair trial. If due process is afforded the defendant in the case before the judge, the conviction and sentence must stand. Only if due process is not afforded may it be vacated.

While petitioner cites statistics for disproportionate impact when the victim is white, he admits that the statistics are inconclusive. Petitioner's Memorandum at 42. He cites expert opinions which declare that the statistics are inconclusive. See Gross & Mauro, *Patterns of Death: An Analysis of Racial Disparities in Capital Sentencing and Homicide Victimization* at 91 (unpublished pre-publication draft, Oct. 1983).

■ Petitioner's argument is reduced to the emotionally unsettling, but legally unsupportable, claim that no one should be deprived of his life until we can be statistically certain that our legal process is untainted by race bias. Petitioner's Memo-

randum at 42. Neither the law nor the Constitution nor reason would permit such an argument to overthrow the orderly processes of the trial in this case, which comported with all of the requirements of due process and which cannot be assailed as unfair. Indeed, the only sure way to meet petitioner's statistical objection would be to award the death penalty on the basis of some sort of racial quota.

Petitioner was convicted of capital murder in a jury trial held in the Circuit Court of Richmond, Virginia. Subsequently, that same jury fixed his punishment at death. The Virginia Supreme Court affirmed both the conviction and sentence. The United States Supreme Court denied certiorari on the issues raised on direct appeal. Petitioner then filed a petition for a writ of habeas corpus in the Circuit Court of Richmond seeking relief on numerous grounds. The Circuit Court denied that petition. The Virginia Supreme Court affirmed on petitioner's appeal on the State habeas corpus issues, and subsequently the United States Supreme Court denied certiorari. Petitioner then filed his first federal habeas corpus petition in this Court advancing most or all of the claims raised in the State habeas corpus proceeding. This Court dismissed that petition. The Court of Appeals affirmed and subsequently denied a petition for rehearing with a suggestion for rehearing en banc. Petitioner filed a second habeas corpus petition with the Virginia Supreme Court which was dismissed by that court. On 24 September 1984 the instant petition was filed with this Court.

The amassed weight of all of these judgments by all these judges renders almost, if not quite, frivolous an argument that petitioner has been denied due process and fundamental fairness. It can only be concluded that petitioner or his counsel are not so much concerned with due process, or fairness, or constitutionality. They are concerned with results. They want the sentence overturned. But in a system based on laws, lawyers, of all people, must recognize that the law's will must be done if we are to preserve our freedoms and liberties. The law in this case secured to petitioner a fair trial and a sentence sanc-

tioned by the Constitution. He was fully entitled to that. He is entitled to no more than that.

For the foregoing reasons, petitioner's writ of habeas corpus will be dismissed and denied. Because this Court has decided the habeas corpus issue, the motion for a stay of execution is moot and, therefore, the motion for a stay is DISMISSED.

An appropriate judgment shall issue.

And it is so ORDERED.