**MASSACHUSETTS MEDICAL SOCIETY; American Medical Association; and Joseph J. O'Connor, M.D., Plaintiffs,**

v.

**Michael S. DUKAKIS, Governor of Massachusetts; James French, Director of the Massachusetts Division of Registration; and Russell J. Rowell, M.D.; Marilyn Griffin, M.D.; Ralph A. Deterling, Jr., M.D.; Marian J. Ego, J.D., Ed. D.; Louise Liang, M.D.; and Melinda Milberg, Esq., Members of the Massachusetts Board of Registration in Medicine, Defendants,**

**and**

**Massachusetts Senior Action Council, Inc.; and Massachusetts Association of Older Americans, Inc., Defendant-Intervenors.**

Civ. A. No. 85–4312–K.

United States District Court,
D. Massachusetts.

June 5, 1986.

Jack R. Biering, Sidley & Austin, Chicago, Ill., Thayer Fremont-Smith, Choate, Hall & Stewart, Boston, Mass., Kathleen Curtis, Michael Kelly, Mass. Medical Soc., Waltham, Mass., Kirk Johnson, B.J. Anderson, American Medical Ass'n, Chicago, Ill., for plaintiffs.

Ellen Bruce, Greater Boston Elderly Legal Services, Daniel Manning, Greater Boston Legal Services, Boston, Mass., for defendants-intervenors.

Carl Valvo, Douglas H. Wilkins, Asst. Attys. Gen., Boston, Mass., for defendants.

## Opinion

KEETON, District Judge.

In this civil action plaintiffs challenge the validity and enforceability of a state statute bearing upon the licensure of physicians in the Commonwealth of Massachusetts, Chapter 475 of the Massachusetts Acts of 1985 ("Chapter 475" or the "Act"). Chapter 475 provides that the Board of Registration in Medicine

shall require as a condition of granting or renewing a physician's certificate of registration, that the physician, who if he agrees to treat a beneficiary of health insurance under Title XVIII of the Social Security Act, shall also agree not to charge to or collect from such beneficiary any amount in excess of the reasonable charge for that service as determined by the United States Secretary of Health and Human Services.

The grounds of challenge include contentions that the statute and regulations implementing it violate due process and are inconsistent with preemptive federal legislation bearing upon balance billing of recipients of medical care who qualify for Medicare benefits under the Health Insurance for the Aged and Disabled Act, 42 U.S.C. §§ 1395, *et seq.* (Title XVIII of the Social Security Act) (the "Medicare Act").

In their amended complaint, plaintiffs also challenge the Act on the basis of Articles I and X of the Massachusetts Declaration of Rights. Defendants contend that this court has no jurisdiction over that claim, citing *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). Plaintiffs apparently concede this point as they have failed to press the state constitutional aspect of their challenge in any of the hearings or numerous briefs which have been filed. I thus address only the federal claims raised by plaintiffs.

## I.

It will be helpful at the outset to take note of terms that will appear frequently in the discussion of Chapter 475 and the Medicare Act.

Under the Medicare Act, physicians are paid for their services on the basis of the "reasonable charge" set by the Department of Health and Human Services ("HHS") for the service. The Medicare program pays 80 percent of the reasonable charge. The patient is responsible for the remainder of the physician's charge.

The reasonable charge is calculated by HHS on the basis of the physician's own "customary charge" for that service as well as the "prevailing charge" in the locality for similar services. 42 U.S.C. § 1395u(b)(3). 42 C.F.R. § 405.502(a).

The Medicare Act provides for two methods of payment. In the first, the physician accepts "assignment." This means that the physician agrees to accept the reasonable charge set by HHS as payment in full. The physician receives 80 percent of the reasonable charge from Medicare and collects the remaining 20 percent of the reasonable charge, but no more, from the patient. 42 U.S.C. § 1395u(b)(3)(B)(ii).

Under the second method, the physician bills the patient directly for the service. 42 U.S.C. § 1395u(b)(3)(B)(i). The patient then collects reimbursement from Medicare in the amount of 80 percent of the reasonable charge. The physician's actual charge under this method may be greater than the reasonable charge. In that circumstance the patient is responsible not only for the remaining 20 percent of the reasonable charge, but also for whatever amount in excess of the reasonable charge the physician has billed. The physician practice of charging an amount greater than the reasonable charge is called "balance billing."

In 1984 Congress established a provision whereby physicians were given certain incentives to become "participating physi-

cians." 42 U.S.C. § 1395u(h)(1). Participating physicians agree to accept on assignment all of the Medicare beneficiaries whom they treat. That is, in return for certain advantages that do not go to "non-participating physicians," participating physicians agree not to balance bill. "Non-participating physicians" are, as the name would suggest, those physicians who do not sign participating physician agreements.

"Medex" is a form of private insurance available to supplement medical care costs of Medicare beneficiaries in Massachusetts.

## II.

Under the Supremacy Clause a state law that "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," is impermissible. *Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941). To determine whether a particular state law stands as such an obstacle, a court must determine whether there is either "a congressional design to preempt the field," or "such actual conflict between the two schemes of regulation that both cannot stand in the same area." *See Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 141, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963).

In this case, plaintiffs contend that Chapter 475 violates the Supremacy Clause under both of these tests. First, they claim that when Congress enacted the Medicare Act, and those portions of the Deficit Reduction Act of 1984 that amended the Medicare Act ("1984 amendments"), it occupied the field of charges by and payments to physicians treating Medicare patients. Plaintiffs contend also that Chapter 475 directly conflicts with various provisions of the Medicare Act. Defendants contend that Congress did not manifest any intention to push the states out of the field of physician billing of Medicare recipients. Nor, according to defendants, does Chapter 475 conflict with any provision of the Medicare Act.

The first branch of the Supremacy Clause test—whether Congress has manifested its design to occupy the field—is purely a question of law. I conclude that Congress has not manifested any intent to preempt the states from enacting the kind of legislation at issue in this case.

In a case such as this, it advances the analysis little to ask merely whether Congress manifested an intent to occupy. There must be, as well, a determination of what the "field" is. .

Plaintiffs would have the court define that field broadly. In support of their contention that Congress intended to preclude states from enacting legislation such as Chapter 475, plaintiffs point to the fact that the system of Medicare payments is funded and administered entirely by the federal government. *See, e.g.,* 42 U.S.C. § 1395j ("There is hereby established a voluntary insurance program ... financed from premium payments by enrollees together with contributions from funds appropriated by the Federal Government.") Plaintiffs place particular emphasis on a statement by Congressman Wilbur Mills, Chairman of the House Ways and Means Committee and a leader in the passage of the Medicare Act, that "it will not be possible for a state agency to administer Medicare." 111 Cong. Rec. H18382 (daily ed. July 27, 1965).

Plaintiffs' references to the statute and to legislative history do not support a contention that the "field" that Congress occupied was all matters relating to the billing of Medicare recipients. Instead, they support a reading that Congress designed an exclusively federal program for payment of benefits toward the medical bills of Medicare recipients. That is, Congress provided that the "administration" of the voluntary medical insurance system called Medicare would be in the hands of the federal government only.

In the context of this question of the scope of the field that Congress occupied, the parties have engaged in some debate over §§ 1395 and 1395x(r). These sections provide respectively that no federal agency

or official will interfere with the practice of medicine and that the definition of "physician" is left to the states as a matter of state law. Defendants argue that these sections evidence Congress' design to give the states an affirmative role in regulating physician behavior as it relates to Medicare patients, including billing practices. Plaintiffs contend that these sections do no more than proscribe any federal interference with physicians' choice of treatment plans and recognize the states' traditional role in determining technical proficiency requirements for physician licensure.

The most accurate reading of these sections lies somewhere between these contentions. Clearly the "practice of medicine," with which the federal government is not to interfere, includes more than treatment choice. So also, the states' role in determining who shall practice medicine and subject to what conditions must include more than the regulation of technical proficiency. The economics of physician practice play a role in both the practice of medicine and the licensure and supervision of physicians; in §§ 1395 and 1395x(r) Congress expressly indicated that both practice and licensure were outside its field of occupation.

On the other hand, defendants' reading of those sections taken broadly would allow the state, in the guise of licensing physicians and regulating the practice of medicine, to bootstrap all kinds of legislation that does overlap with matters expressly regulated by the Medicare Act. Thus, it cannot properly be said that any particular state law purportedly regulating physicians or the practice of medicine is automatically vindicated as an exercise of the authority granted (or, more precisely, not taken away), in §§ 1395 and 1395x(r). Instead, each state law must be scrutinized to see whether it indeed deals with a matter that Congress has taken as exclusively its own for regulation elsewhere in the Medicare Act or instead one that Congress has left in that residual unoccupied territory that ordinarily surrounds congressional action under our federal system.

Sections 1395 and 1395x(r) thus do not provide a shield for every state law purportedly enacted as a regulation of physicians or the practice of medicine. However, consistently with those sections of the statute and legislative history that describe the scope of federal regulation as including only the funding and administration of a system of voluntary medical insurance for the aged, these sections do evidence a congressional design to occupy only a limited portion of the broad "field" of medical care for the elderly.

Defendants have also made some suggestion that § 1395b expressly recognizes states' authority to reduce the costs of medical care to Medicare beneficiaries by legislation. The section reads,

§ 1395b   Option to individuals to obtain other health insurance protection

Nothing contained in this subchapter shall be construed to preclude any State from providing, or any individual from purchasing or otherwise securing, protection against the cost of any health services.

Read in context, the language "[n]othing ... shall preclude any State from providing ... protection" clearly contemplates protection in the form of supplemental payments, not regulatory reduction of charges. It strains the language too far to suggest that Congress meant to address the issue of state regulation of health care costs in a section in which the subject at hand was supplemental insurance.

■ In summary, I conclude that nothing in the Medicare Act or its legislative history evidences a congressional design to occupy any field so broad that it would include regulation such as Chapter 475. There is nothing to indicate congressional preemption of all state regulation of physician billing as applied to recipients of Medicare. Particularly in an area such as medical care, a prototypically traditional local interest, there is no justification for inferring a congressional design to preempt state regulation absent strong evidence of such design. Cf. Philadelphia v. New Jersey, 437 U.S. 617, 621 n. 4, 98 S.Ct. 2531,

2534 n. 4, 57 L.Ed.2d 475 (1978); *New York Dept. of Social Services v. Dublino*, 413 U.S. 405, 413, 93 S.Ct. 2507, 2512, 37 L.Ed.2d 688 (1973). To do so here in the absence of any such evidence would be especially unjustified.

### III.

In order to rule on plaintiffs' arguments that Chapter 475 violates the second branch of the Supremacy Clause test because it is in conflict with the Medicare Act, I must first turn to the consideration of the role that "facts" play in this case. To clarify the relevance of the fundamental nature of the fact disputes to issues regarding how these disputes are to be resolved (including disputed contentions about admissibility of evidence), I proceed first to explain the conclusions I have reached as to the non-adjudicative nature of most, and perhaps all, of the disputes of fact in this case.

The term "adjudicative" fact is part of established usage. *Cf.* Fed.R.Evid. 201 (Notes of the Advisory Committee). In contrast, no settled terminology has been adopted as a common label to designate all of the various kinds of facts that, together, stand in contrast with "adjudicative" facts. In the remainder of this Opinion I use the term "non-adjudicative" to refer to the whole array of facts that are relevant to determining a generally applicable rule of decision and not (or at least, not alone) to deciding a particular controversy between particular parties.

Also a part of established usage is the term "finding," used to refer to a trial court's decision of an adjudicative fact dispute. In contrast, the terminology used to refer to the decision of a non-adjudicative fact dispute varies. "Finding" is sometimes used, but other terms, including "conclusion," are also sometimes used. In the remainder of this Opinion I use either "finding" or "determination" to refer to the decision of a non-adjudicative fact dispute by whomever made (e.g., a trial court, a higher court or a legislature).

Aided by the Notes of the Advisory Committee, the commentaries of other writers there cited, and judicial opinions cited below, I conclude that some (though certainly not all) among the contrasting characteristics of adjudicative and non-adjudicative facts may be described in the following ways:

### (1) Effect Generally of Fact Findings Upon Future Cases

An adjudicative fact finding in one case has no force as precedent and no effect in subsequent cases except to the extent determined by the law of *res judicata,* including issue preclusion. *Cf. Second Restatement of Judgments* §§ 17–29 (1982).

In contrast, a non-adjudicative fact finding does have force generally in later cases. Such a finding made by a legislature as a basis for enacting a statute ("legislative" fact) is reviewable in courts, if at all, only under standards developed in constitutional litigation. *E.g., Railway Express v. New York*, 336 U.S. 106, 109, 69 S.Ct. 463, 465, 93 L.Ed. 533 (1949) (for purposes of due process challenge to state regulation the court will not itself weigh evidence to determine wisdom of regulation but will defer to the judgment of local authorities unless that judgment is shown to be "palpably false").

A non-adjudicative fact finding of a court as a reason for deciding an issue of law in a particular way ("precedential" fact) is effective not only in the case at hand (subject to review in higher courts) but also in future cases to the extent determined by the law of *stare decisis*. *Cf. EEOC v. Trabucco*, 791 F.2d 1 (1st Cir.1986).

"Legislative" fact findings made by a legislature as a basis for enacting a statute and "precedential" fact findings made by a court as a basis for deciding an issue of law are, in a sense, a part of the body of determinations that have force as law. Ordinarily, however, it is the legal rule itself rather than the factual determinations that were part of the explicit or implicit reasons for its adoption that we speak of as law.

Even so, a court is not free to hold a legal rule inapplicable to the case at hand because the court disagrees with the fact determinations on which that rule was explicitly or implicitly based. Instead, a court must apply the legal rule unless it determines that the rule is to be abrogated generally, and not just disregarded in the case at hand. A court may abrogate a rule by holding a statute unconstitutional, and a court may overrule its own precedents. If, for example, a court of last resort determines that the factual premises of a precedent are incorrect—either because circumstances have changed or because advances in knowledge have revealed error—the court may overrule.

### (2) Characteristics of Findings in Jury Trials

In a jury trial, adjudicative fact findings of the jury on issues as to which, under the evidence, reasonable persons could differ, are binding upon the parties and cannot be set aside either by the trial court or on appeal merely because a court would find differently on the evidence. *E.g.,* Wright, *Law of the Federal Courts* § 95 at 473 (3d ed. 1976).

In contrast, non-adjudicative fact disputes are not properly submitted to a jury; they are resolved in the same way in jury trials as in non-jury trials.

### (3) Characteristics of Findings in Non-Jury Trials

A trial judge's adjudicative fact findings in a federal non-jury trial are reviewable under the standard prescribed in Fed.R. Civ.P. 52(a) and are set aside on appeal only if "clearly erroneous." This proposition is amply supported by precedent. *E.g., Icicle Seafoods, Inc. v. Worthington,* —— U.S. ——, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986).

In contrast, I conclude, both on principle and with at least suggestive support in judicial opinions, that with respect to non-adjudicative fact findings higher courts owe no deference to a trial court's findings and may make their own determinations of such facts. For example, a case recently before the Supreme Court of the United States presented a sharp dispute concerning the effects of "death qualification" of jurors, during voir dire, upon the impartiality of the trial jury in the guilt phase of trial upon a capital felony murder charge. The defendant, as respondent before the Supreme Court, argued that the "factual" findings of the District Court and the Eighth Circuit on the effects of "death qualification" were reviewable by the Supreme Court only under the "clearly erroneous" standard of Fed.R.Civ.P. 52(a). The Supreme Court answered:

> Because we do not ultimately base our decision today on the invalidity of the lower courts' "factual" findings, we need not decide the "standard of review" issue. We are far from persuaded, however, that the "clearly erroneous" standard of Rule 52(a) applies to the kind of "legislative" facts at issue here. See generally *Dunagin v. City of Oxford, Mississippi,* 718 F.2d 738, 748, n. 8 (CA5 1983) (en banc) (plurality opinion of Reavley, J.). The difficulty with applying such a standard to "legislative" facts is evidenced here by the fact that at least one other Court of Appeals, reviewing the same social science studies as introduced by McCree, has reached a conclusion contrary to that of the Eighth Circuit. See *Keeten v. Garrison,* 742 F.2d 129, 133, n. 7 (CA4 1984) (disagreeing that studies show relationship between generalized attitudes and behavior as jurors), cert. pending, No. 84–6187.

*Lockhart v. McCree,* —— U.S. ——, —— n. 3, 106 S.Ct. 1758, 1762 n. 3, 90 L.Ed.2d 137 (1986).

■ A number of the reasons underlying the conclusion that non-adjudicative fact findings should not be subject to the "clearly erroneous" standard are discussed in the *Dunagin* plurality opinion. A question to which non-adjudicative facts are relevant "is not a question specifically related to this one case or controversy; it is a question of social factors and happenings which may submit to some partial empirical solu-

tion but is likely to remain subject to opinion and reasoning. *See* Fed.R.Evid. 201 (advisory committee note)." 718 F.2d at 748 n. 8. It would thus be inappropriate to treat the findings reached by a particular judicial trier of fact on "social factors and happenings" with the same deference with which his or her findings on discrete occurrences between particular parties are treated. The *Dunagin* plurality opinion also noted the special role of the appellate courts in resolving issues of constitutional law. That role would be significantly eroded if the higher courts' determinations were made to "hinge on the views of social scientists who testify as experts at trial." *Id.* For these reasons and others stated in this Opinion, I conclude that higher courts will be free to examine non-adjudicative facts *de novo* rather than obliged to accept all but clearly erroneous findings of non-adjudicative facts by the trial court.

Of course, as noted in subdivision (1) above, neither a trial court nor an appellate court may set aside or disregard "legislative" determinations of fact on the basis of which a statute was enacted, except to the extent that the court determines that as a matter of constitutional law the legislature's reliance on those facts cannot withstand scrutiny. *See Railway Express, supra; see also Dunagin,* 718 F.2d at 748 n. 8 ("If the legislative decision is not binding at this stage, at least it carries great weight. Certainly it cannot be thrust aside by two experts and a judicial trier of fact.").

An underlying theme of the three qualities thus far discussed is that adjudicative facts are specific to the case at hand ("case facts" or "discrete facts") and, in contrast, non-adjudicative facts bear upon the determination of what legal rule shall be applied to cases generally ("general facts"). Often, and perhaps typically, "general" fact findings are generalizations about human behavior or human institutions, including economic and social phenomena. However, "general" fact findings may be about other aspects of the broad context in which particular cases arise; they may be about "laws" of nature, for example.

### (4) Historical and Evaluative (or Interpretive) Facts

A distinction may be observed between "historical" facts and "evaluative" (or "interpretive") facts.

Typical of disputes of "historical" fact, as the term is used in this context, are disputes about who did what, when and where, and whether with or without a defined state of mind. *Cf.* Fed.R.Evid. 201 (Notes of the Advisory Committee); *Sandstrom v. Montana,* 442 U.S. 510, 521–23, 99 S.Ct. 2450, 2457–58, 61 L.Ed.2d 39 (1979) (requiring fact finding as to state of mind of defendant in criminal case rather than allowing imposition of criminal liability for presumed intent).

Typical of disputes of "interpretive" or "evaluative" fact are disputes about whether what was done violated a legal standard for evaluating conduct (such as the negligence standard or the "proximate" cause standard), *cf. Second Restatement of Torts* §§ 291, 431 (1965), or in some other way satisfied some prerequisite of liability. *Cf. O'Neill v. Dell Publishing Co.,* 630 F.2d 685, 687 (1st Cir.1980) (ultimate finding of "substantial similarity" in copyright case is mixed question of fact and law, not to be decided on summary judgment if evidence must be weighed). As illustrated by the *O'Neill* opinion, the kind of determination that contrasts with a finding of "historical" fact is often described as a finding on a "mixed question of fact and law."

In contrast with adjudicative fact disputes, which may involve either "historical" or "evaluative" ("interpretive") facts, *e.g.,* O'Neill, supra, non-adjudicative fact disputes rarely, if ever, concern "historical" facts. That is, disputes of non-adjudicative fact rarely center on happenings—who did what, when or where. Even when "data" are brought to bear, *cf. EEOC v. Trabucco, supra,* the emphasis of the dispute is not upon the uninterpreted multitude of historical facts that constitute the data but instead upon disputed assertions as to whether the data are complete, or at least constitute an adequately representa-

tive sample, and upon what interpretive inferences or evaluative findings may properly be derived from or based upon them.

### (5) Taking Judicial Notice

A court may take judicial notice of adjudicative facts "not subject to reasonable dispute." Fed.R.Evid. 201(b).

It may reasonably be argued that the concept of "judicial notice" is inapplicable to non-adjudicative facts. *See generally* K. Davis, *Administrative Law* §§ 15:1–20 (2d ed. 1980) (discussing the role of adjudicative and legislative facts in agency and judicial decisionmaking and the role of judicial notice). In any event, if the phrase is used in relation to non-adjudicative facts, either its meaning must be sharply modified or else it applies to only a very small percentage of non-adjudicative facts. The reason is that non-adjudicative facts are typically in sharp dispute, as controversies over legislation well illustrate. Thus, if "judicial notice" is limited to facts "not subject to reasonable dispute," it is inapplicable to all reasonably disputable non-adjudicative facts. Sometimes, however, "judicial notice" is used in a very different sense, merely to indicate that the court determines relevant facts independently of evidence offered at trial. In this broad sense, of course, the phrase might be extended to all non-adjudicative fact finding.

### (6) Applicability of Rules of Evidence

In making adjudicative fact findings, courts apply formal rules of evidence and, at least if timely objection is made, may not base findings on evidence that is inadmissible under those rules.

■ In relation to non-adjudicative fact finding, it is difficult to find authority precisely in point. I conclude, however, that on principle, and with at least some suggestive support in judicial opinions, both trial courts and appellate courts, in making non-adjudicative fact findings, are free to draw upon sources of knowledge beyond evidence that is admissible under the formal rules of evidence that apply to adjudicative fact finding. An appellate court, in its decisionmaking, is not confined to the record of evidence presented to the trial court. It may consider additional sources referred to in appellate briefs, and may even resort to independent library research. For example, the Supreme Court did not confine itself to record evidence in considering the fundamental issues presented in *Brown v. Board of Education*, 347 U.S. 483, 494 n. 11, 74 S.Ct. 686, 692 n. 11, 98 L.Ed. 873 (1954). *See also Dunagin*, 718 F.2d at 748 n. 8; Fed.R. Evid. 201 (Notes of the Advisory Committee).

Although litigants may, either from an abundance of caution or for practical reasons of effective advocacy, present testimonial evidence of expert witnesses on disputed non-adjudicative fact questions—as the parties have done in this case—and trial courts may receive such evidence, it does not follow either that the parties must offer such evidence or that a trial court is bound to receive it, or having received it, is bound to consider it as if it were being presented in relation to a dispute of adjudicative fact.

In all but a small percentage of cases coming before the courts, disputes of fact that must be resolved to determine the outcome relate to adjudicative facts. Indeed, it is only a very small percentage of judicial opinions that even take note of a distinction between adjudicative and non-adjudicative facts. Partly for this reason, and partly as well because of fundamental differences between adjudicative and non-adjudicative facts, some (but by no means all) of which are outlined here, I conclude that rules of evidence and procedure fashioned for resolving adjudicative fact disputes were not designed for resolving non-adjudicative fact disputes and, at the least, must be reexamined before being applied in resolving non-adjudicative fact disputes.

### (7) Applicability of "Standing" Requirements

Are "standing" requirements, fashioned to determine one's qualifications for partici-

pating in an adversarial proceeding for resolving adjudicative fact disputes, applicable as well to participation in resolution of non-adjudicative fact disputes? This issue will be examined briefly in Part VI below.

## IV.

Before trial of this case commenced, holding some tentative but not fully considered views about the issues of adjudicative and non-adjudicative fact finding discussed in Part III above, and influenced substantially by prudential considerations concerned with sound judicial administration, I denied cross-motions for summary judgment without prejudice to renewal of the substantive contentions advanced by movants and, with the full cooperation of the parties and their counsel, set the case for expedited trial. With the evidence and post-trial submissions before me, I now address the remaining contentions of the parties.

## V.

With respect to whether Chapter 475 conflicts with any of the various provisions of the Medicare Act, the parties on each side contend that they are entitled to judgment as a matter of law. Defendants also contend alternatively, if they are not entitled to judgment as a matter of law on this issue, that plaintiffs must prove as a matter of adjudicative fact, as I have used that term above, that there is a conflict between the two acts. In support of this alternative position, defendants cite *Kargman v. Sullivan*, 552 F.2d 2 (1st Cir.1977), a case in which a factual inquiry was undertaken to determine whether the plaintiff landlords were subject to conflicting requirements by local rent control regulations and the regulations promulgated by the Department of Housing and Urban Development. In *Kargman*, evidence was taken and factual findings made by the trial court. Both the trial court and appeals court apparently treated at least some of the facts in that case as adjudicative facts. Although I indicated at the early stages of the proceedings in this case that I was of the tentative view

that findings of adjudicative facts made on the basis of evidence offered by the parties were unnecessary to a decision in this case, we proceeded with a trial in which all parties had an opportunity to offer the testimony of witnesses and other evidence so that a factual record would be developed in the event a higher court determines that, under *Kargman* or some other analysis, such an evidentiary record is necessary to decision.

After further consideration, I adhere to the view that this case is appropriately decided without reference to questions of adjudicative fact, and I rest my decision on purely legal grounds (legal grounds which, of course, take account of some non-adjudicative facts). Nevertheless, as a matter of sound judicial administration I shall proceed, as an alternative basis of decision, to make findings on those questions of fact that under a different theory of the case might be material "adjudicative" facts.

Before turning to my findings on those arguably material disputes of fact, I note one dispute that even if characterized as a dispute of fact (a dubious proposition), I conclude is not material under any theory of the case. The parties are in some disagreement about how Chapter 475 may ultimately be interpreted and enforced. For purposes of both the Due Process and Supremacy Clause challenges, however, this disagreement is not material.

Both sides agree that Chapter 475 prohibits Massachusetts physicians who have obtained a new license or have had an old license renewed on or after February 10, 1986, from requiring their Medicare-covered patients to pay more than the "reasonable charge" established by Medicare. That is, physicians may not "balance bill" patients for an amount greater than the reasonable charge. (Patients do continue to pay the 20 percent co-insurance required by Medicare, but that co-payment is included in the reasonable charge figure).

The parties do not agree over certain interpretation and enforcement issues. Plaintiffs, for example, fear that even accidental or good faith variance from statuto-

rily prescribed conduct may constitute an actionable violation of Chapter 475. Plaintiffs also fear that because the ban on balance billing is established as a condition of licensure that any violation will result in nothing less than the severe sanction of license revocation. Finally, plaintiffs fear that the Board of Registration will have no discretion in its choice of when and how to sanction. Defendants dispute all or most of these characterizations of how the Act will be administered.

I conclude that under no likely theory of the case is this dispute material. The difference between the two sides' interpretations will have no bearing on whether Chapter 475 can withstand constitutional challenge. That is, the analysis stated below of the validity of Chapter 475 under the Supremacy Clause and the Due Process Clause holds equally for the Act as interpreted by plaintiffs and as interpreted by defendants. For these reasons I need not resolve the parties' conflicting interpretations of Chapter 475 (even assuming such a resolution could properly be characterized as a "finding," or, in the alternative, as a determination of an unresolved issue of state law that would raise still more issues of federal-state comity and practice).

### VI.

Another brief detour precedes consideration of factual disputes that might under some theory of the case be considered material.

The key dispute between the parties on which evidence was taken and findings are made below is this: will Chapter 475 have the effect of restricting the access to medical care of Medicare beneficiaries in Massachusetts? The parties apparently agree that such a restriction would conflict with an important purpose of the Medicare Act —namely, insuring the availability of medical care to the elderly.

There is a serious problem in this case, however, arising from the circumstance that it is plaintiff physicians who are attempting to prove the detrimental effects that Chapter 475 will allegedly have on the health care of the elderly. A serious and obvious conflict of interest exists between the physicians (who bill) and the class of elderly patients for whose benefit Medicare was enacted (and who must pay those bills). Indeed, two organizations whose stated purpose is the promotion of the interests of the elderly chose to intervene on the side of defendants in this case.

Where the court is treating a question as one of adjudicative fact, that is, taking evidence offered by adversarial parties and making findings based on the weight of that evidence, the requirements of "standing"—who may properly raise a particular issue—are appropriately stricter, at least in most circumstances, than where a question is treated as one of non-adjudicative fact. The underlying objective of assuring that a genuine case or controversy is before the court, with the adverse interests adequately represented, is more clearly implicated in adjudicative than in non-adjudicative fact disputes. Where the court is considering non-adjudicative facts—for example, the whole range of information on which a legislature did or might have relied—it is less important that the roles of who may present what information be sharply defined. Indeed, the court itself may go to reference books for enlightment with respect to this kind of information. *See* Part III(6), *supra.* But where a court is considering evidence presented by opposing sides in accordance with the rules of evidence for the purpose of itself making a finding as to what is the truth of the matter (rather than determining what a legislature might reasonably have found to be fact), the Constitution and the decisional law have traditionally set well-defined limits on who is in a position to present what. *See Singleton v. Wulff,* 428 U.S. 106, 112, 96 S.Ct. 2868, 2873, 49 L.Ed.2d 826 (1976); *Friedman v. Harold,* 638 F.2d 262, 265–67 (1st Cir.1981).

In *Singleton* the Supreme Court enunciated two separate inquiries necessary to a standing determination: first, has the party alleged "injury in fact;" and second, "as a prudential matter," is the party a "proper

proponent[ ] of the particular legal rights" asserted. 428 U.S. at 112, 96 S.Ct. at 2873. Here, defendants do not dispute that plaintiffs have alleged injury in fact. They do assert, however, that as a prudential matter plaintiffs are inappropriate advocates of the rights of Medicare beneficiaries. I agree with defendants as to the applicability to this case of the teaching of *Friedman v. Harold* that as a prudential matter a party can have no standing to assert the legal interests of an adverse party. Plaintiffs' interests are clearly adverse in some respects to those of Medicare beneficiaries because of the fundamental conflict of interest between these two groups over physician billing practices.

■ I thus conclude that insofar as there is a dispute of fact over the effects of Chapter 475 on access to medical care of the elderly that under some theory of the case is material, plaintiffs have no standing to advocate the position that Chapter 475 will restrict such access. Nonetheless, for the same reasons of sound judicial administration that, in the alternative, I put aside earlier my conclusion that findings of adjudicative fact are unnecessary to a decision in this case, I do so here also. That is, in the alternative, I put aside my conclusion that plaintiffs have no standing to take the position they have taken on this issue in order to make findings on issues the parties may contend a higher court would find necessary to disposition of this controversy.

### VII.

■ At the trial, I deferred ruling on numerous evidentiary issues. I now conclude that I need not rule on each of the evidentiary questions reserved at trial for the following reason: even if each of the evidentiary disputes is resolved most favorably to plaintiffs—that is, even if all of their arguably objectionable evidence is considered and all of defendants' arguably objectionable evidence is not considered—I find as factfinder, by a preponderance of the evidence, that Chapter 475 will not have the effect of diminishing the access of Medicare beneficiaries in Massachusetts to medical care.

Plaintiffs' evidence was principally of two types. First, they offered the affidavits, live testimony and deposition testimony of a number of individual physicians licensed to practice in Massachusetts. In addition, they offered the expert testimony of a specialist in the economics of health care.

A number of the individual physicians testified to the various actions they would take or have already taken in response to the enactment of Chapter 475. Some physicians stated that they would stop or had stopped treating Medicare patients, *see* Affidavit of Floyd L. McIntyre, M.D.; Attachment F to Affidavit of plaintiffs' expert witness (letters from twenty-five orthopedic surgeons); *see also* Affidavit of Benjamin Liptzin, M.D. (relating difficulty in referring Medicare patients). Others testified that they would leave or had left the state to practice elsewhere. *See* Deposition of Luther M. Strayer, M.D.; Deposition of Peter A. Monroy, M.D.; Attachment F to Affidavit of plaintiffs' expert witness.

For a number of reasons, I find that these statements by individual physicians have little weight as tending to prove that Chapter 475 will diminish access of Medicare beneficiaries in Massachusetts to medical care. First, as a matter of sound statistical method and common sense, no reliable inferences as to how the thousands of physicians in Massachusetts generally will behave can be drawn from the expressions of a handful of individual physicians. Not only is this sample too small to sustain any such inferences, but it is quite obviously neither random nor representative. Second, I find that not only are these individual expressions of little value in assessing physician behavior generally, but also they are of dubious value even for assessing the actual behavior of those physicians who made the statements. The statements were, for the most part, clearly made with this litigation and the ongoing political debate in mind. The similarity of many of the letters from orthopedists in particular

and the active role played by the plaintiff physician organizations as litigants and lobbyists also support the inference that many of the statements by individual physicians reflect at least some degree of organized political advocacy. For these reasons I find the expressions of individual physicians of actions taken or intended in response to Chapter 475 extremely unpersuasive support for the proposition that access to health care of Medicare beneficiaries will be impaired by that Act.

Plaintiffs' expert in health care economics testified that the Act will have the following detrimental effects: (1) it will reduce the supply of physician services; (2) it will cause a significant number of physicians to choose not to come to the state, or, if already here, to leave the state or refuse to treat Medicare patients; (3) it will restrict access particularly in rural areas and other locales with a low proportion of physicians relative to patients; (4) it will increase total Medicare expenditures for physician services; (5) it will discourage innovation in medical treatment; and (6) it will create the greatest disincentive to treat Medicare beneficiaries for the best qualified physicians.

I find these opinions to be neither sufficiently founded nor sufficiently persuasive to support a finding that the access to medical care of Medicare beneficiaries will be impaired by Chapter 475. First, to the extent that the expert's opinions are based on the expressions of individual physicians I find, for the reasons discussed above, that those opinions are deserving of little weight. Indeed, I find certain occurrences at the trial with respect to the expert's use of these letters so troubling as to be worthy of comment. During the course of his direct examination by plaintiffs' attorney, the expert witness was asked the following question with respect to three of the letters from individual physicians:

Q: My question is whether these letters, to the best of your knowledge, are the sort of letter that would reasonably be relied upon by experts in health care economics in forming opinions or inferences?

A: Yes, they are.

Trial Transcript, Vol. 2, page 105. And again with respect to the twenty-five letters from orthopedic surgeons:

Q: Do you regard those letters as being of a type reasonably relied upon by experts in health care economics in forming opinions or drawing inferences?

A: Yes, I do.

*Id.* at 106.

The responses by an otherwise creditworthy expert witness to these leading questions are so patently incredible that I give them no weight whatsoever. Indeed, it is disturbing that both lawyer and witness would yield to the temptation to stretch this far to meet a perceived need for satisfying foundation requirements such as those of Fed.R.Evid. 703 ("facts or data" not admissible in evidence may nevertheless be used by an expert as the basis for an admissible opinion if they are "of a type reasonably relied upon by experts in the particular field"). Moreover, the entire line of questioning and the responses elicited underline the absurdity of determining the constitutionality of state laws on the basis of evidence of this kind, and the more clearly so if the evidence is required to be proffered in a trial court subject to rules of evidence designed for resolving disputes of adjudicative fact. The opinions of experts in a case like this may be helpful to a court that is reviewing legislative rationality. They are among many sources from which a court may learn the non-adjudicative legislative facts on which a legislature could have relied. But it is plainly off the mark to suggest that it would be appropriate for this court to make what is in effect its own determination of the wisdom of the challenged act—whether consistent with or contrary to a legislative finding implicitly made in enacting the legislation—and to do so on the basis of such evidence as this. The legislature did not make its decision on the basis of the opinions of the particular experts the parties chose to call before this court. Nor

is the validity of its decision to be determined as if it had done so.

Another reason I find that the opinions of plaintiffs' expert witness cannot support plaintiffs' contentions is that two of those opinions (numbers (1) and (4) above) are plainly inconsistent. The reduction of *supply* of physician services—opinion (1)—would be expected to lead to a decrease in services rendered. The rationale for the expected increase of total Medicare *expenditures* for physician services—opinion (4)—included an increase in services rendered. It cannot be that physician services will both increase and decrease. It is the second of these alternatives that I find, based on the expert's own analysis, is more likely to occur. Data drawn from the price controls on physician fees during the Nixon administration indicate that when fees are frozen, a greater number of services are performed. This phenomenon is consistent with the common sense expectation that physicians faced with a limit on fees will have an incentive to increase the volume of services provided in order to maintain their income level. Access to medical care will thus tend to be increased in association with the increased services received by Medicare beneficiaries generally.

The plaintiffs' expert's most persuasive point concerns the disparate impact that the Act may have on rural areas or other areas with fewer doctors for the patient population. It is expectable that if there is any adverse effect—that is, if even a few doctors stop treatment of Medicare beneficiaries—this effect will work the greatest hardship on those who live in areas with fewer alternative providers of medical care. I find, however, that plaintiffs' expert's predictions are exaggerated and based in large part on data that significantly overestimate the number of physicians who would not continue to treat Medicare patients. The expert relied for the most part in his discussion of low-physician-density areas on data from 1981 and 1982 relating to how many physicians were willing to accept assignment. He does not dispute, however, that since that time the incentives provided by Congress for becoming a participating physician have significantly increased the number of physicians willing to accept assignment. I find unpersuasive the arguments that the 1981–1982 figures are more useful than more recent figures. I thus find that the expert's prediction of the magnitude of adverse effect on low-physician-density areas must be discounted.

I also find no sufficient foundation for the expert's opinions that there will be an adverse impact on medical innovation and that the best qualified doctors will be the most likely to refuse to treat Medicare patients. Even if I were to accept that some likely effect along these lines had been proved, I could not find that plaintiffs have established that it would be anything other than de minimis.

Finally, and most importantly, I reject one assumption of the plaintiffs' expert witness that pervades his testimony. I find that any opinion founded on the assumption that Massachusetts physicians will act wholly, or even in large part, on the basis of purely economic factors is not deserving of significant weight. The expert's testimony, both in its specifics and taken as a whole, relies substantially on an assumption that economics are the primary factor (or at least a determinative factor in the "but for" sense) in motivating physician behavior. Paragraph 27 of the affidavit of plaintiffs' expert is an example:

27. The ban on balance billing also biases the Medicare system against high quality medical care. The Medicare reimbursement mechanism already fails to distinguish between high quality and low quality providers. Balance billing, however, enables the high quality providers to seek additional payments from their patients or their patients' private insurers. Absent balance billing, there is no incentive for physicians to take the time and effort to provide high quality services. There also is no incentive to make the investment in training and equipment necessary to provide high quality services.

This paragraph and others like it fail to take into account the extent to which non-economic "incentives" motivate physician behavior—for example, a physician's pride in his or her work, commitment to the ethic of care of the profession, personal concern for his or her patients, and intellectual curiosity in the best and newest methods of treatment.

I find that the assumption that the only "incentives" physicians have to practice in Massachusetts or to treat Medicare beneficiaries are economic defies both common sense and the realities of physician practice in this state. Both plaintiffs' expert and defendants' expert have testified that despite the fact that Massachusetts is among those states with the very lowest physician income, it is also the state with the highest number of physicians *per capita*. Moreover, the number of physicians in both absolute and relative terms has continued to increase despite other bans on balance billing effective in Massachusetts—the Blue Shield ban and the Medex ban. There is simply no way to reconcile these undisputed facts with an assumption that physicians' choices to come to and stay in practice in Massachusetts have been motivated primarily or in any "but for" sense by economic incentives. The most sensible inference to draw from these facts is that there have been and will continue to be factors other than economics that powerfully influence doctors to come to the state and stay here.

It is of course likely that the economic effects of Chapter 475 will displease many physicians. However, I find that neither the expert testimony nor other evidence offered by plaintiffs supports the inference that more than a very few physicians will, in light of all the factors that may influence them, choose to leave the state or to cease treating Medicare patients. I find it is far more likely that there will be, in the words of a very candid and credible physician witness called by plaintiffs, Dr. Liptzin, in answer to a question on physician response to the Medex ban on balance billing, "a lot more grumbling but not a reluc-tance to treat." (Trial Transcript Vol. 2, page 60).

In summary, I find that plaintiffs have failed to prove that the effect of Chapter 475 will be to reduce the access of Medicare beneficiaries in Massachusetts to medical care. Thus, even were I to conclude that a *Kargman*-type factual showing could appropriately establish conflict in this case, plaintiffs could not prevail because they have not succeeded in making such a showing.

## VIII.

I turn now to a consideration of plaintiffs' several arguments that Chapter 475 conflicts with the Medicare Act as a matter of law. Plaintiffs contend, and correctly so, that the Supremacy Clause is no less vital when the state law at issue conflicts with a federal law that permits rather than requires certain action. Thus, the circumstance that under the Medicare Act physicians are permitted but not required to balance bill is not decisive of the Supremacy Clause issue. There is no dispute that the Medicare Act does permit—in the sense that it does not prohibit—balance billing. Plaintiffs argue that this case is therefore like *Fidelity Federal Savings & Loan Association v. de la Cuesta*, 458 U.S. 141, 102 S.Ct. 3014, 73 L.Ed.2d 664 (1982), in which the Supreme Court held that restrictions on due-on-sale clauses created by California law impermissibly conflicted with a federal regulation that permitted but did not require federal savings and loan associations to use due-on-sale clauses.

The federal law at issue in this case is distinguishable, however, from that at issue in *de la Cuesta*. First, the subject of the *de la Cuesta* regulation was federal savings and loan associations—wholly federal creations. Physicians are, of course, licensed solely by the state. Both cases involve a combination of federal and state interests at work: In *de la Cuesta* the federal interest was in administering a program of financial assistance to home buyers and owners, the state interest in regulating the sale of property; here, the feder-

al interest is in administering a program of financial assistance to elderly in need of medical care, the state interest in regulating the practice of medicine, including the practice as it relates to the elderly. In *de la Cuesta*, however, there was an express announcement of federal policy to prohibit state regulation of any kind in connection with federal savings and loan associations. The Federal Home Loan Bank Board ("Board") had a " 'longstanding policy' of authorizing federal savings and loan associations to enforce due-on-sale clauses 'subject only to express limitations imposed by the Board.' " *Id.* at 155, 102 S.Ct. at 3023 (quoting 46 Fed.Reg. 39123, 39124 (1981)). In striking down the state law, the Supreme Court relied in part on the preamble to the federal regulation at issue which unequivocally expresses the Board's determination to displace state law:

> Finally, it was and is the Board's intent to have ... due-on-sale practices of Federal associations governed *exclusively* by Federal law. Therefore, ... exercise of due-on-sale clauses by Federal associations shall be governed and controlled *solely* by [§ 545.8–3] and the Board's new Statement of Policy. *Federal associations shall not be bound by or subject to any conflicting State law which imposes different ... due-on-sale requirements*, nor shall Federal associations attempt to ... avoid the limitations on the exercise of due-on-sale clauses delineated in [§ 545.8–3(g)] on the ground that such ... avoidance of limitations is permissible under State law. 41 Fed.Reg. 18286, 18287 (1976) (emphasis added).

(Footnote omitted.) *Id.* at 158, 102 S.Ct. at 3025.

There is nothing in the Medicare Act even remotely approaching such a clear expression of preemption of state law. In *de la Cuesta* the language of the regulation clearly indicated that the associations had the option to use due-on-sale clauses and that the states could not infringe on that option in any way. Nothing in the Medicare Act manifests any intent to insulate physicians' use of balance billing. The

federal law says only that it will not prohibit balance billing. It does not speak to the question whether a state might do so.

The analogy to *First Federal Savings and Loan Association of Boston v. Greenwald*, 591 F.2d 417 (1st Cir.1979), also relied upon by plaintiffs, suffers from the same defect. In *Greenwald* the First Circuit struck down a state statute requiring federal savings and loan associations to pay interest on certain escrow accounts. The court held that the statute conflicted impermissibly with "explicitly exclusive" federal regulations specifying the conditions under which federal savings and loan associations must pay interest on escrow accounts. *Id.* at 426. The court quoted the regulation, " 'Except as provided by the contract, a Federal association shall have no obligation to pay interest on escrow accounts apart from the duties imposed by this paragraph.' " *Id.* at 425 (quoting 12 C.F.R. § 545.6–11(c)). The federal regulations at issue in *Greenwald* not only permitted federal savings and loan associations not to pay interest on certain types of escrow accounts, but also expressly prohibited the states or anyone else from requiring them to do so. The Medicare Act contains no such prohibition.

■ I conclude that in this case the determination by the federal government to permit certain action was not, as in *de la Cuesta* and *Greenwald*, in and of itself a determination that no state could prohibit it. I thus conclude that in order to prevail on their claim that Chapter 475 conflicts with the Medicare Act, plaintiffs cannot rely on a general assertion that the states cannot prohibit what Congress has allowed but must point to a particular purpose or provision of the federal statute with which the state Act conflicts.

### IX.

I thus turn to a consideration of plaintiffs' primary theory of particular conflict—that the prohibition on balance billing created by Chapter 475 is inconsistent with an affirmative congressional choice to al-

low balance billing. In support of their contention that Congress made such an affirmative choice, plaintiffs point to a provision in the Medicare Act itself and various comments in the legislative history.

Plaintiffs first cite § 1395u(b)(3)(B) in support of their argument that Congress expressly created a federal right or expectation that physicians could choose not to accept assignment but could instead balance bill. Section 1395u(b)(3)(B) reads in pertinent part:

> ... payment will be made—
> (i) on the basis of an itemized bill; or
> (ii) on the basis of an assignment under the terms of which (I) the reasonable charge is the full charge for the service ...

I do not read this section as creating a right or even an expectation on the part of physicians that if they do not accept assignment they may charge whatever they want. This section only provides for the method by which payment may be made. It evidences no affirmative right and creates no reasonable expectation that because a physician chooses to seek payment by means of an itemized bill he or she will be subject to no limits on what that bill may include. Reading this section in light of common sense and the traditional role of local government in regulating medical care, one can infer that Congress might well have expected, if they thought about it at all, that what a doctor may charge in his or her bill may be subject to some independent state regulation. I cannot read this section as creating an affirmative right or expectation to be free of a state regulation on billing that is not otherwise in conflict with the provisions or purposes of the Medicare Act.

Nor do the excerpts from legislative history cited by plaintiffs manifest any intent by Congress to create such a right or expectation. For example, plaintiffs place particular emphasis on an example given by Congressman Mills of how the Medicare payment system would work:

> And, what if the doctor says that what the insurer is paying, before he ever operates, is not sufficient to satisfy him? He might say 'My fee is so much, $2,000, but this cost that you are indemnified against is only $1,000.' What then? We pay 80 percent of the $1,000 to the patient, and the patient pays the doctor $2,000, including the payment under the plan. If in the community where he lives, the sum of $1,000 is the customary, prevailing and reasonable fee against which we are indemnifying the patient, the doctor still makes the arrangement with his patient, or the patient makes it with his doctor to pay the difference.

111 Cong.Rec. H7214 (daily ed. April 7, 1965). But nothing in this excerpt, nor the longer passage from which it was taken, supports a reasonable expectation that a federal right to charge $2,000 was being created or that the fee which a doctor charges may not be subject to any limitation independent of the Medicare Act. This excerpt simply describes the way in which Medicare payments would work and indicates that the Medicare Act itself would not place any limitation on the physician's charge.

Plaintiffs point also to a statement by Senator Edward Kennedy during the debates over the 1984 amendments: "the fundamental compromise that permitted passage of Medicare in 1965 ... was the bargain ... that physicians would still be able to pursue additional private charges from their patients, free of Government restraint." 130 Cong.Rec. S5498 (daily ed. May 9, 1984). In the first instance, the usefulness for understanding a statute's meaning of a statement made almost twenty years after its enactment is dubious. Even if this statement is accepted at full value, however, it will not bear plaintiffs' reading. That a political bargain was struck whereby Congress did not place restrictions on physician billing *in the Medicare Act* does not mean that it guaranteed freedom from all other sources of restriction. Congress' failure to prohibit a certain action, whether as part of a political compromise or otherwise, does not without

more create a federal right or expectation to so act.

Finally, plaintiffs argue that Congress' rejection in 1984 of an amendment to the Deficit Reduction Act that would have required mandatory assignment evidences an affirmative choice to guarantee to physicians freedom to charge more than the reasonable charge. For a number of reasons, I conclude that this vote by Congress and the legislative debate that preceded it do not support the inference that plaintiffs would have the court draw.

First, "unsuccessful attempts at legislation are not the best guides to legislative intent." *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 381–82 n. 11, 89 S.Ct. 1794, 1801–02 n. 11, 23 L.Ed.2d 371 (1969) (citing *Fogarty v. United Mine Workers*, 340 U.S. 8, 13–14, 71 S.Ct. 5, 8, 95 L.Ed. 10 (1950)). The circumstances of the 1984 defeat of the mandatory assignment amendment make the wisdom of that rule abundantly clear. Because when legislators vote to enact a bill they do so for a variety of different, and oftimes somewhat conflicting, reasons, any attempt by a court to discern the manifested meaning of a statute by looking to statements of reasoning by individual legislators is problematic. *See New England Power Co. v. New Hampshire*, 455 U.S. 331, 342, 102 S.Ct. 1096, 1102, 71 L.Ed.2d 188 (1982); 2A *Sutherland Statutory Construction* § 48.-17 (4th ed. 1984). This problem is exacerbated when the legislators vote to reject a bill. Most important, where Congress has enacted a bill, the language of that bill becomes the primary source from which manifested meaning is discerned. *See Massachusetts Financial Services, Inc. v. Securities Investor Protection Corporation*, 545 F.2d 754, 756–57 (1st Cir.1976), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977). A defeated bill is utterly lacking in that which gives the language of an enacted bill its power: its status as the law of the land.

Moreover, the debate surrounding a defeated bill is a less reliable indicator of congressional purpose than that surrounding an enacted bill because the reasons for defeat may be even more varied. In this instance, at least some legislators who *favored* cost containment of physician services rejected mandatory assignment as "the wrong fight at the wrong time." *See* 130 Cong.Rec. H2823 (daily ed. April 12, 1984) (remarks of Rep. Gradison).

Others apparently rejected the amendment because the focus of congressional attention in the Deficit Reduction Act was, as its name suggests, to save federal dollars. Several of those legislators who spoke against the amendment did so on the ground that mandatory assignment was not an effective solution to the problem at hand because it would not reduce the cost of Medicare to the federal government. *See, e.g.*, 130 Cong.Rec. H2854 (daily ed. April 12, 1984) (remarks of Rep. Pickle) ("... the task before us today is to pass a bill that will produce the savings outlined in our budget resolution, but mandatory assignment does not produce a dollar of budget savings....").

Is the court to attempt to count how many legislators rejected mandatory assignment because it did not go far enough or was not fisc-saving rather than, as plaintiffs contend, because of a desire to preserve physicians' freedom to bill? Is the reasoning articulated by the court-counted majority then to be accepted as the prevailing meaning of the bill's defeat? Clearly this would be not only impossible as a practical matter, but inappropriate as a method of judicial statutory construction.

Finally, even if the court were to restrict its consideration to those excerpts from the legislative debate cited by plaintiffs that do indicate that some legislators rejected the mandatory assignment amendment because of potentially adverse effects on medical care to the elderly, I could not conclude that those legislators evidenced any design to prohibit the states from restricting physicians' charges. The great majority of statements cited by plaintiffs do not express the position that mandatory assignment would be detrimental to the health care access of all elderly Americans and

thus must be rejected nationwide. Rather, most of the statements cited express one of two concerns: first, that because proper hearings and other investigation had not been conducted on the question, the potential effects of mandatory assignment on access were unknown, *see, e.g.,* 130 Cong. Rec. H2853 (daily ed. April 12, 1984) (remarks of Rep. Rowland); 130 Cong.Rec. H2799 (daily ed. April 12, 1984) (remarks of Rep. Stenholm) ("I am unalterably opposed to the mandatory assignment provisions at this time.... [They] have not been subject to congressional hearings and review. We have no idea what kind of impact they could have on the medicare program.... Until we can be more informed about these effects we should not approve the mandatory assignment provisions."); and, second, that in certain parts of the country and in certain rural areas that the effects might be adverse. *See, e.g.,* 130 Cong.Rec. H2800 (daily ed. April 12, 1984) (remarks of Rep. Jones) ("[M]andatory assignment creates potentially difficult problems for States in the South and the West, States such as Oklahoma and Louisiana.").

The statement of Congressman Roberts of Kansas, for example, articulates both concerns:

> But what is wrong with this simple approach is that no one here knows how many physicians would continue to treat our medicare patients.

> .     .     .     .     .

> This has special impact in my area. In my big first district with 58 counties, access to health care is the real problem, not doctors and not what they are charging. Goodness knows, we wish we had more doctors. Our communities are struggling to retain their physicians and keep their hospital doors open. This proposal puts another obstacle on retaining access to health care in our rural areas.

130 Cong.Rec. H2824 (daily ed. April 12, 1984). This statement and others like it cited by plaintiffs evidence the concerns that Congress knew too little about the potential effects of mandatory assignment and feared too much the adverse effects it

might have in certain areas to make it a wise legislative choice for Congress to enact mandatory assignment at that time on a nationwide basis. Nothing in these statements indicates any design to prohibit state legislatures on the basis of their own assessment of the circumstances of their particular locale from making a different choice.

Thus, even considering those statements from the legislative debate which are most in sympathy with plaintiffs' position, I can find only a disinclination to use federal power at that time to limit physician charges nationwide. I find no indication, even in these most anti-assignment statements, to guarantee physicians' freedom to charge against state regulation.

I therefore conclude that plaintiffs cannot prevail on their claim that Chapter 475 conflicts with an affirmative choice made by Congress in the Medicare Act and its amendments to guarantee the freedom to balance bill.

### X.

The next section with which Chapter 475 conflicts, plaintiffs argue, is § 1395u(h)(1). This section created the "participating physician" program in which a physician treating Medicare recipients may elect before October 1 of any year beginning with 1984 to accept all his or her Medicare patients on assignment for one year. Physicians are given certain inducements to sign a participating physician agreement including listing in a directory distributed to all Medicare recipients and freedom from certain provisions of the 1984 fee freeze to which they would otherwise be subject. Section 1395u(h)(1) reads in pertinent part, "Any physician or supplier may voluntarily enter into an agreement with the Secretary to become a participating physician or supplier." Plaintiffs argue that by prohibiting physicians from balance billing, the state has made involuntary what Congress has commanded must be voluntary.

This argument must fail. Nothing in Chapter 475 requires a physician to become

a participating physician. It is true that because Chapter 475 prohibits balance billing Massachusetts physicians will have an additional incentive to become participating physicians. That is, because non-participating as well as participating physicians are prohibited from balance billing in Massachusetts, there is less reason not to become a participating physician. But adding an incentive to act in a certain way is not the same thing as making the act involuntary. I conclude therefore that no conflict exists between § 1395u(h)(1) and Chapter 475.

### XI.

The final section with which Chapter 475 conflicts, according to plaintiffs, is § 1395u(b)(4)(D). As part of the incentives to induce physicians to sign participating physician agreements, Congress provided that the customary charge profiles of non-participating physicians but not of participating physicians would be frozen. It is the customary charge profile of a physician from which the reasonable charge allowed by Medicare is in part derived. Thus, participating physicians who have agreed to accept the reasonable charge amount as payment in full are nonetheless allowed to make a higher charge for the purpose of raising their customary charge profiles.

Plaintiffs argue that Chapter 475 insofar as it provides that physicians may not "charge to or collect from" Medicare beneficiaries "any amount in excess of the reasonable charge" conflicts with § 1395u(b)(4)(D). This is so, plaintiffs argue, because participating physicians will be unable to make charges above the reasonable charge in order to raise their customary charge profile without running afoul of Chapter 475.

This argument will not withstand scrutiny. Although Chapter 475 prohibits participating physicians, like all other physicians, from charging to or collecting from the *beneficiary* any amount in excess of the reasonable charge, nothing in the Act prohibits physicians from submitting a higher charge to Medicare for the purpose of increasing their customary charge profiles.

Indeed, the language of Chapter 475 is virtually identical to the federal regulation governing the mandatory assignment to which participating physicians agree: a physician accepting assignment "will not charge or collect from the individual or any other source an amount in excess of the applicable unmet deductible." 42 C.F.R. § 405.1675(a)(1)(i). Chapter 475 is not inconsistent with § 1395u(b)(4)(D) for the same reason § 405.1675(a)(1)(i) is not. A physician may still submit a higher "charge" to Medicare in order to raise his or her customary charge profile without actually charging that amount to the beneficiary. I conclude therefore that Chapter 475 does not conflict with § 1395u(b)(4)(D).

In summary, then, I conclude that Chapter 475 does not violate the Supremacy Clause. It neither encroaches upon a field occupied by Congress nor conflicts with any provision or manifested purpose of the Medicare Act.

### XII.

Plaintiffs contend also that Chapter 475 violates the Due Process Clause of the Fourteenth Amendment. In order to pass constitutional muster, plaintiffs argue, the Act must bear a rational relationship to a physician's "fitness or capacity to practice." Defendants disagree that this is the appropriate standard, arguing that it is necessary only for the Act to bear a rational relationship to a legitimate state purpose.

In support of their argument that it is a higher standard of relationship to "fitness or capacity" which is applicable, plaintiffs place particular emphasis on *Schware v. Board of Bar Examiners of New Mexico*, 353 U.S. 232, 77 S.Ct. 752, 1 L.Ed.2d 796 (1957). In *Schware*, the Supreme Court reversed the denial of petitioner's application to take the state bar examination. The Supreme Court held that the denial on the basis of petitioner's former use of aliases, arrests and membership in the Communist Party, in the circumstances of that case, violated due process. In the course of the opinion the Court wrote,

A State can require high standards of qualification, such as good moral character or proficiency in its law, before it admits an applicant to the bar, but any qualification must have a rational connection with the applicant's fitness or capacity to practice law. *Douglas v. Noble,* 261 U.S. 165 [43 S.Ct. 303, 67 L.Ed. 590]; *Cummings v. Missouri,* 4 Wall. 277, 319–320 [18 L.Ed. 356]. Cf. *Nebbia v. New York,* 291 U.S. 502 [54 S.Ct. 505, 78 L.Ed. 940]. Obviously an applicant could not be excluded merely because he was a Republican or a Negro or a member of a particular church. Even in applying permissible standards, officers of a State cannot exclude an applicant when there is no basis for their finding that he fails to meet these standards, or when their action is invidiously discriminatory. Cf. *Yick Wo v. Hopkins,* 118 U.S. 356 [6 S.Ct. 1064, 30 L.Ed. 220].

*Id.* at 239, 77 S.Ct. at 756. The Court did not object to New Mexico's requirement of good moral character as such, but held that there was "no evidence in the record which rationally justifies a finding that Schware was morally unfit to practice law." *Id.* at 246–47, 77 S.Ct. at 760.

Plaintiffs argue that under *Schware,* the states are prohibited from enacting conditions of professional licensure unless they are related to the licensee's "training, skill, or experience" or "integrity or moral character." (Plaintiffs' Reply Memorandum, Docket No. 50 at 33). Plaintiffs then argue that the billing of Medicare beneficiaries above the reasonable charge is insufficiently related to "integrity or moral character" for purposes of due process.

Defendants argue that the cases dealing with professional licensure requirements, including *Schware,* do not support such a narrow reading of the scope of the states' authority to regulate. The language in *Schware,* defendants argue, cannot be singled out to support the stricter standard advocated by plaintiffs. First, the quoted passage in *Schware* must be read in the context of the case: the Supreme Court was not focusing on what could or could not be legitimate requirements of licensure because they accepted New Mexico's "good moral character" requirement as legitimate. The Court's focus was instead on the lack of evidence to support a determination that the particular applicant Schware had not met that requirement. Second, other cases on this subject do not support the proposition that *Schware* adds a higher burden to ordinary due process scrutiny. Citing *North Dakota State Board of Pharmacy v. Snyder's Drug Stores, Inc.,* 414 U.S. 156, 94 S.Ct. 407, 38 L.Ed.2d 379 (1973); *Williamson v. Lee Optical of Oklahoma, Inc.,* 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955); *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934); *Lupert v. California State Bar,* 761 F.2d 1325 (9th Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 241, 88 L.Ed.2d 251 (1985); and *Walden v. Board of Registration for Nursing,* 395 Mass. 263, 479 N.E.2d 665 (1985), defendants argue that a rational basis test is as appropriate for licensure requirements as it is for other kinds of state regulation enacted in furtherance of the public welfare.

I am inclined to agree with plaintiffs that *Snyder's Drug, Lee Optical* and *Lupert* are weak support for defendants' argument that a mere rational basis test applies, because this issue was not directly presented or considered in those cases. In each of the three cases, plaintiffs did not dispute that the state's purpose was to insure "fitness or capacity to practice" in its narrowest sense: the actual skill or proficiency of the provider of services. Instead, the plaintiffs in each case directed their challenge to the means the state had chosen to further that purpose. In a context in which the undisputed state purpose was to insure the provider's technical ability, a court might well have found it unnecessary to state explicitly that a nexus with fitness or capacity was required. For this reason these cases are unpersuasive support for the argument that a rational basis test will be appropriate even where the state objective is arguably unrelated to a licensee's technical ability to provide services.

*Walden* speaks more directly to the problem in this case. In *Walden* the Supreme Judicial Court of Massachusetts upheld against a due process challenge a condition of licensure that required nurses to sign a certificate attesting that they had paid their state income taxes. The Supreme Judicial Court rejected Walden's claim that *Schware* imposed a requirement that a condition of professional licensure must be rationally related not merely to any legitimate state purpose but to the licensee's fitness or capacity to practice. 479 N.E.2d at 672 (the "language [in *Schware*] has not, however, been given the limiting effect on the rationality test which the plaintiff claims for it"). The Supreme Judicial Court went on to hold that even if *Schware* did impose a higher standard, the Commonwealth could reasonably have concluded that one who committed the "antisocial act" of failing to pay taxes demonstrated "unfitness to carry on a responsible profession in which adherence to other laws is required." *Id.* (citations omitted). Even though not formally binding on this court, the *Walden* decision is instructive.

The relationship to *Schware* of *Nebbia*, the last case to be considered with respect to this question of what standard applies, is the most interesting. In *Nebbia* the Supreme Court upheld state floors on milk prices for certain kinds of distributors. The Court held that the regulation, enacted not to insure the ability of the distributors to perform their duties but to insure an orderly market for milk, was permissible because reasonably related to a legitimate state purpose. 291 U.S. at 537–39, 54 S.Ct. at 516. "[T]he right ... to pursue a calling, may be conditioned," wrote the Court. *Id.* at 528, 54 S.Ct. at 512. This statement was followed by a footnote referring to cases dealing with members of various occupations, including physicians. *Id.* at 528 n. 27, 54 S.Ct. at 512 n. 27.

Plaintiffs' effort to distinguish *Nebbia* as mere "economic" regulation is troubling. Both the milk price floor in *Nebbia* and the balance billing ban of Chapter 475 were enacted in furtherance of the public welfare as conditions on a "calling." Both are "economic" regulations in the sense that they set limits on the price of certain goods and services. The only apparent distinction is the nature of the calling. Is there to be one rule for professionals merely because they are professionals and another for those whose occupations are non-professional? The cross-citations in *Nebbia* to an early physician licensure case, *Dent v. West Virginia*, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889), and in *Schware* to *Nebbia* would seem to indicate that the Supreme Court has rejected this opprobrious notion. Indeed, if any distinction is to be made, it would seem that the state interest is greater in regulating those who would hold themselves out to the public as professionals and thus more deserving of deference.

It is a forceful argument that the Supreme Court did not intend in *Schware* to afford professionals an exception to the *Nebbia* standard. Moreover, there is an absence of any very consistent line of post-*Schware* decisions enforcing such a distinction. The three cases cited by plaintiffs which use the *Schware* language are distinguishable from this case. In *Martin-Trigona v. Underwood*, 529 F.2d 33 (7th Cir. 1975), the Seventh Circuit entertained a due process challenge by a bar applicant to the procedures employed by the state for determining good moral character. Because the question before it was the adequacy of procedures for enforcing what was admittedly a requirement related to fitness or capacity—good moral character—the court had no occasion to consider whether the nexus with fitness or capacity was indispensable.

Similarly, in *Louis v. Supreme Court of Nevada*, 490 F.Supp. 1174 (D.Nev.1980), the court was not considering the validity of a particular requirement. Instead, it was faced with a challenge to a practice whereby the state granted some applicants a waiver from a certain requirement. It was the disparate application of an admittedly legitimate qualification that was at issue. Thus, as in *Martin-Trigona v. Underwood* and, indeed, *Schware* itself, a rul-

ing on the appropriate test of legitimacy was not necessary to the decision.

Finally, *Keenan v. Board of Law Examiners of State of North Carolina*, 317 F.Supp. 1350 (E.D.N.C.1970), is inapposite. That case, like *Supreme Court of New Hampshire v. Piper*, 470 U.S. 274, 105 S.Ct. 1272, 84 L.Ed.2d 205 (1985), decided by the Supreme Court last term, dealt with a challenge to a requirement that bar applicants be state residents on the ground that it impermissibly discriminated against citizens of other states. A licensure rule that treats in-state and out-of-state licensees differently raises entirely different problems under our constitutional scheme than one that treats all licensees identically. For this reason, neither *Keenan* nor *Piper* is decisive of the issues in this case.

For these reasons it may be that defendants' proposed "rational relation to a legitimate purpose" standard is the correct one. If this is so the Act must be upheld. The containment of medical costs for the elderly is plainly a legitimate concern of the Commonwealth. It is also plain that the legislature could reasonably determine that requiring physicians not to balance bill their Medicare patients was a means of addressing that concern, and that the licensure process was an effective mechanism for enforcing that prohibition. I conclude that the reliance of the legislature on the legislative facts that medical care costs are a serious problem for the elderly and that conditions on licensure are an effective means of obtaining physician compliance with state regulation is well within the bounds of rationality required by ordinary due process scrutiny.

But even if plaintiffs are correct that *Schware* and the case law on conditions of licensure generally require some nexus with fitness or capacity to practice, their challenge must fail.

■ Nothing in the case law of conditions on professional licensure attributes to "fitness or capacity to practice" the narrow definition advocated by plaintiffs. Nor would such a definition, limiting sharply what a state might choose to deem a matter of fitness or capacity, be consistent with the broad powers which states hold to determine for themselves how best to promote the welfare of their people. Even if, under the Due Process Clause, a state may only require of a licensee that which is related to fitness or capacity, it must be that the state has some latitude in choosing what it considers to be necessary indications of fitness and capacity. However narrow or broad that latitude may be, I conclude that the power to require those licensees who choose to treat a particularly needy segment of the population to do so for limited fees lies within that latitude. Stated another way, I conclude that the legislature's determination as a matter of legislative fact that the provision of cost-contained services to the elderly is a necessary part of what it means to be fit and capable to practice in this state is not outside the bounds of what the Due Process Clause permits.

A strong analogy to that legislative choice lies in the requirement that lawyers serve some clients at little or no charge. The requirement to perform *"pro bono"* work or to accept without compensation a court-appointment to represent a needy client has been upheld numerous times by various courts. *See, e.g., Williamson v. Vardeman*, 674 F.2d 1211, 1214–15 (8th Cir.1982) (and cases cited therein); *United States v. Dillon*, 346 F.2d 633, 635–36 (9th Cir.1965). Last term the Supreme Court indicated its approval of this line of decisions in *Piper*. In rejecting New Hampshire's argument that it should be allowed to require state residency of members of its bar because in-state attorneys would be more likely to perform *pro bono* work, the Court stated, "[a] nonresident bar member, like the resident member, could be required to represent indigents and perhaps to participate in formal legal aid work." 105 S.Ct. at 1280. In a footnote to this statement, the Court noted the recent adoption of the El Paso, Texas, bar of just such a mandatory *pro bono* plan. *Id.* at 1280 n. 22.

Plaintiffs distinguish this line of cases by pointing out that lawyers have unique responsibilities as "officers of the court." But in this context, I conclude that this distinction between lawyers and physicians is without significance. In *Piper* itself, a professional licensure case, the Court down-played the importance of the "officer of the court" factor. *Id.* at 1277–78. As are lawyers, doctors are entrusted with the performance of a special role. As do lawyers, they "enjoy a 'broad monopoly … to do things other citizens may not lawfully do.'" *Id.* at 1278 (quoting *In re Griffiths*, 413 U.S. 717, 731, 93 S.Ct. 2851, 2859, 37 L.Ed.2d 910 (1973)). As with lawyers, the state has a special interest in protecting its citizens by regulating those who fill that monopolistic role.

In sum, I conclude that the choice of the state legislature to designate the provision of cost-contained services to the elderly as a condition of licensure does not offend the Due Process Clause, even if that clause requires that such conditions reasonably relate to fitness or capacity to practice.